is not warranted unless the female is shown to be medically unable to have any additional children. Thank you. Thank you very much. It was an honor being before this court. Are you privately retained or is this pro bono for you? No, I'm privately retained, Your Honor. I mainly practice before the sentence. Okay. Well, I hope we see you again. You both did a very fine job. And unfortunately, we don't always see petitioners in these cases represented by the kind of counsel that their issues really merit. So, it's a delight seeing you. Your argument was a big help to us. Ms. Maher, I'm not sure I've seen you before or not, but hopefully we'll see you again. Thank you. Thank you for being here. Take a minute on your advisement. The next case is AARP v. EEOC. Ruki, you can hear okay? Yes, I can. Yes, I can. Thank you. Sir? Good afternoon. Good morning, Judge Albicert. Good afternoon. Good morning. Thank you. May it please the Court, I'd like to reserve three minutes for rebuttal, if I could, please. Sure. The issue I'd like to discuss today and focus on is the standard of review of agency action under Section 9 of the ADEA. According to the EEOC, they need only announce that an exemption is necessary and proper in the public interest and it is within the scope of their authority under Section 9. Consequently, the EEOC claims that they can issue an exemption, as they attempted here, that literally would allow discrimination in health care benefits against approximately 10 million retired individuals. Presumably, under the same logic, the EEOC could issue an exemption that would impose mandatory retirement at age 70, although that practice has also long ago been prohibited by the statute and by congressional intent. Why don't you try to back up? I know that's where you want to take it. Can I back you up one step here? Of course, Your Honor. It seems to me the thing with the driving is obviously the Brand X decision. And I went back in Erie County, and I'll ask Mr. Yang, maybe he can help me. I'm trying to find the all-important gap that is the condition preceding for the distinction between stardesizes and chevron that the Court was concerned about in Brand X. I can't find it. I can't find it in Erie County where the analysis of Erie County leaves enough room to say that the statute that is issued here is ambiguous. We gave one interpretation as to whether or not this kind of disparate act rises to the level of age discrimination under the EDEA. But there's another way of looking at the statute. If that's what we had said, then it seems to me clearly the EEOC under Chevron and under Brand X could come in and do what they always do in agency statutory interpretation cases, use their expertise to interpret the statute in a manner which eliminates the ambiguity. That's what Chevron said. That's the purpose of the Chevron doctrine, so that we don't have courts basically doing rulemaking under the guise of decision-making. We don't have agencies doing adjudication that was left to the courts under Article III as opposed to agency rulemaking. I can't find it in the analysis of Erie County. Am I missing something here? No, of course not, Your Honor. You're not missing a thing at all. In fact, you're absolutely correct that Brand X is entirely consistent with Chevron. Brand X confirms the fundamental premise of Chevron, which is that unless there's a gap in the statute, the agency is not free to regulate. Correct. Now, you're absolutely— What difference does Section 9 make? If that's right, what difference does the Section 9 analysis make? Well, and that's the flaw in the government's argument, is they don't ever apply Chevron. In fact, Your Honor, keep in mind here that the government didn't dispute— Keep in mind that in Brand X, the agency regulated in disagreement with the circuit precedent in the Ninth Circuit. Here, the EEOC has admitted that the statute prohibits discrimination based on age and virtually all employee benefits. There was never any disagreement about the circuit precedent. And turning to your direct question, Your Honor, about Erie itself, the touchstones that the court used in Erie could not have been clearer to indicate absolute certainty of congressional intent. Keep in mind that the entire purpose of the Older Workers Benefit Protection Act was to make perfectly clear that the age discrimination statute applied to virtually all employee benefits across the board. There was no dispute about that. They amended the definition of compensation terms and conditions of employment. The court focused on that in Erie County. And to me, the most important part of Erie County is this court focused on what Congress did with the safe harbor provisions, the equal cause, equal benefit provision. The Congress actually incorporated a regulation that said you can coordinate with Medicare under certain very specific defined circumstances. I'd like to go back to Judge McKee's question, but from the other side. It seems to me if you look at the case that the Ninth Circuit was relying on when it invoked stare decisis, that the way that opinion is written is not much different from the way Erie is written. It's not written in terms of, well, this is the only interpretation. This is a permissible interpretation. They don't use those words. They're just looking for basically an interpretation. I don't know. Did you see anything in that original Ninth Circuit case that made it a very different kind of decision from Erie? Well, I think the fundamental difference in the Ninth Circuit case was that there was more than one way to read that statute. Okay, so you're getting to the merits now. You're saying that there was... That's what made it a Brand X case, which was that there was more than one reasonable interpretation. Here in Erie, there was not. Before you go on, isn't it, Mr. O'Regan, I looked at Portland, too, and the circuit opinion in Brand X, and it is written the same way we wrote Erie County. I thought when I read Portland, I was going to find the kind of statutory construction which had maybe some weasel language in it or left open the possibility that this is our best guess that reasonable minds could differ. And it's not in there. Portland is written with a kind of certainty. This is what this statute means, and this is how you can classify these ISPs under a token. Well, I think this court clearly satisfied any requirement of determining what specific congressional intent was in Erie. The court looked at the language. The very purpose of the amendment says... Remember what was before the court in Erie was an agency interpretation, which then the court upheld. The court wasn't called upon to determine whether that was the only possible interpretation. Well, fair enough, Your Honor, but it wasn't an agency interpretation that was subject to the litigation. That was a piece of litigation between private parties, and the EEOC participated as amicus to lend its view. I know, but the validity of the agency regulation was the crux of the dispute between the private parties, wasn't it? Yes, yes, the equal cost, equal benefit regulation. But keep in mind, too, Your Honor, that in Erie County, the EEOC advocated that that was unmistakably the only way to interpret the statute. The government, which is why they don't dispute the circuit present here. That's why they have to pursue an approach here that avoids the contrary-to-law standard, which I want to remind the court is set forth clearly in Section 706.2 of the APA. This case was brought as a frontal assault on an agency action under 706 of the APA. Count 1 of our complaint, paragraph 1 at Joint Appendix 59, says that the exemption is contrary-to-law under Section 706.2 of the APA. And Count 1 of our complaint on page 79 of the Joint Appendix alleges a violation of the Administrative Procedure Act. Now, everything, the court would never have used this solely permissible language in Erie because it didn't know about Brandeis, of course. But look at the line. I don't know if I knew it, and I've said this before. That's not how courts speak. I mean, I cannot imagine a statutory interpretation case where we would ever say this is the only conceivable interpretation of this language because you almost never have language that cannot be interpreted. You can always make an argument that there's another interpretation that should apply. I'd like to look, Judge McKee, at what the court did say, not what it didn't say. But what it did say is it said accordingly the plain language of Section 623F through its reference to the regulation indicates Congress intended. That satisfies the court's obligation to determine what congressional intent was. Keep in mind this regulation that provided for Medicare offsets that the court approved of, there would have been no reason, it would be nonsensical to have a safe harbor and tuck it into a statute unless the underlying statute clearly prohibited discrimination. And beyond that, the court adopted the very view espoused by the EEOC, which is that to read the ADA any other way would lead to irrational gaps in coverage. And the government even said it would be inconceivable that Congress intended any other view of the statute. It can't be heard at all? Sure. I've been trying to get in for some time. I just want to put it, there's only about two more minutes left. And let us assume that we don't agree with you on this point. Is that your whole case? No, Your Honor. There's two levels of review. There's the contrary to law standard that applies under Chevron and also applies under Section 706-2 of the Administrative Procedure Act. But that doesn't make the agency home free. Then you have to apply the arbitrary, capricious, or an abusive discretion standard under the APA. We've argued in our briefs that this regulation has no rational relationship to the perceived harm that the government used as a motivator for the regulation, nor does it accomplish what it purports to accomplish. But let me ask you this. You concede that the DEA has at least some authority under Section 9 of ADEA. You concede that? Of course they do, Your Honor. They have authority to issue regulations, and they have authority to issue exemptions. But all of that authority is subject to Chevron and subject to the requirements of the Administrative Procedure Act. Certainly they have authority. And the additional gloss on their authority under Section 9 is finally set forth in the statute itself. With regard to exemptions, it has to be a reasonable exemption. It cannot be any exemption. And it has to be necessary and proper in the public interest. I don't understand your argument there. If it's a true exemption, you don't need statutory ambiguity, right? If the statute provides something and you provide an exemption to it, you accept that the statute is providing something other than the exemption provides. Now, I understand your second point that the exemption has to be reasonable and in keeping with the intent of the statute. But I don't understand why you would have an exemption if you merely have a lack of clarity, which the agency can resolve. If you have a lack of clarity, if there is an ambiguity, the agency may regulate. If there is no ambiguity, the agency can never regulate contrary to congressional intent, period. That's what Chevron teaches us, and that's the end of the inquiry. There are two cases cited in the EOC's brief, Your Honor. But you didn't move on to the next point. Congressional intent, except if there is an exemption. So to answer what congressional intent is, is not just a one-step process. I disagree respectfully, Your Honor, that there can never be an exemption to a plain statutory provision. And I'll cite the court to two cases in the EOC's brief. At page 38, AFL-CIO v. Donovan, they cited it's a Service Contract Act case. The government cites it for the proposition that the Secretary of Labor can issue reasonable exemptions. Under that case, the court applied the contrary-to-law provisions of the APA and of Chevron to an exemption, to exemptions that were issued by the court. So my response, Your Honor, respectfully, is that even exemption authority cannot be exercised contrary to the plain intent of Congress as expressed in the substance of the statute. So what you're really saying is there is no such thing as an exemption. I'm saying that they can issue exemptions in gray, ambiguous, and gaps pursuant to Chevron and pursuant to Brand X, but that a regulatory agency can never overturn the plainly expressed intent of Congress through clear statutory provisions. Never. That's not an executive agency's job. Your Honor, I think we said in your accounting that, given the specific context of the suit there, it appeared to us that Medicare eligibility could be included within the ADEA for purposes of whether or not that's age discrimination. You're saying that the EEOC could come along and say that issue a rule exempting employers from having to consider Medicare benefits and Medicare eligibility in terms of whether or not that comes within the ADEA. I didn't say that very well, but hopefully you got what I'm trying to draw out. Well, I did, Your Honor, and that's exactly what they're doing here, because their exemption doesn't require that the post-65 retiree actually receive Medicare. It's based on age, so it could be an individual who isn't even entitled to Medicare or hasn't applied to Medicare, and under this exemption, that individual's benefits would be cut. So the hypothetical you're asking is not a hypothetical at all, and that's exactly what this exemption would do. And again, Congress did not intend, never wanted that result to occur. They spent almost a year passing the Older Workers Benefit Protection Act to make patently clear that that would not occur, and the administrative agency can now not undo that through an exemption or a regulation. Thank you, and I think you have some time for a vote. Mr. Yang, if you need more time, Mr. Yang, we let Mr. Macaronis, am I saying that correctly? Yes. I'm going to go over a little bit, so if you need more time, when the red light comes on, don't look around for the thunderbolt. Just, Judge Obstert, because your voice is low, so we let you in for a question. Can you, like, make a sign or something? Because you're very soft. Your voice is coming over the telephone very softly. Well, I've been shouting. I've never seen you like this before. You're not the most responsive person. Open the window and maybe you can hear me. I'll do my best, Judge Obstert, to find your questions. Tony Yang, Anthony Yang, for the Department of Justice, representing the EEOC. Let's start with a non-legal observation, right? Judge Obstert, I appreciate that, because he is an awesome and old common-pleas attorney, and sometimes we lose sight of what these suits are really about. Reading these briefs, and let me preface this by saying, as I read your brief and all the amicus briefs, I kept looking for directions to where this gap was going to appear in Erie County, and all I found was the unintended consequences of our Erie County decision. Well, Your Honor, I think that's fair, because the issue here is an exemption from a provision of the Act. Let me finish and tell you why this is wrong. What looked like happened here is, after we decided in Erie County, and things began happening that we may or may not have anticipated, the EEOC clearly did not anticipate, there was a rulemaking problem began, and in the middle of that, after Judge Brewer initially ruled, Brian Dykes comes down, and your folks, and perhaps you, said, this is our lucky day, because now we can say there is a gap in the statute. We don't have to go to Congress and try to change the legislation. That's not quite right, Your Honor. The District Court, sua sponte, asked for a briefing on Brian Dykes. All right. We did not approach the Court. Brian Dykes' RIP was pending to this Court. And in fact, you don't agree with the District Court. We don't agree with some of the District Court's reasoning on the statutory question. You like the outcome. The judgment is correct and should be affirmed, Your Honor. Well, Your Honor, I think it's important to figure out what exactly Chevron deals with. Chevron deals with what is the meaning of a provision that's ambiguous. When a court determines through the… Back up a second, because you're putting the rabbit in the hat when you say what is the meaning of a provision that's ambiguous. That's exactly what Chevron's all about, Your Honor. A provision that may be ambiguous has some meaning, and that's determined either by reference to extrinsic materials, and sometimes when an agency has authority to speak with the force of law on resolving that ambiguity, you defer to the agency's interpretation. The first step of Chevron is determining whether or not there's an ambiguity. Of course, Your Honor. But if there's no ambiguity, Chevron really has no bite, because Chevron comes in with respect to the deference to an agency interpretation of an ambiguous provision. But the bottom line is, regardless of whether the provision is ambiguous, in which case you're discerning what the meaning of the provision is through extrinsic aids or through deference to the agency, or if the provision is completely unambiguous, it speaks directly to the question at issue, you're still determining what the provision says. Now I direct you to Section 9 of the ADEA, which is at appendix page 2A of the identitor brief. It provides that the EEOC may provide such reasonable exemptions from any or all provisions of this chapter, but that's the ADEA, as it may find necessary and proper in the public interest. It is an exemption from the provision. Let's stop there a second. What if a court has said that aids discrimination is not in the public interest because it violates a statute? Could the EEOC come along and say, based upon what we see happening now, using hindsight, we find that this specific action is permissible? It depends, Your Honor. Obviously, the question of reasonableness is fairly contextual, and what we can do is look to the exemption here. We can have a good discussion about whether it was reasonable and necessary and proper in the public interest, but the fundamental first question is whether the agency has the power to issue an exemption that would exempt otherwise regulated conduct by a statute. And I point you to the Congressional section. Where does the power come from? If it has the power, where does it have to come from? It comes from Congress. Section 9 of the Act provides explicit exemption authority. Can you say you're going to give it to the executive? Well, Your Honor, if Congress provides an intelligible principle to guide executive decision-making, this is the whole non-delegation principle, public interest has consistently been seen to be adequate in that context, yes, Congress can provide some limited authority for an agency to interpret and implement and provide exemptions from the Act. What's limited about this exemption? This exemption targets a narrow practice concerning retiree health benefits. Retiree health benefits are generally and still, even under the exemption, regulated by the ADEA. In fact, we've provided some sites, at least two or three sites in our brief to the actual rule, which says every other application of the ADEA Section 4 of the Substantive Provision to retiree health benefits are as they were before. Only when an employer coordinates the benefits with Medicare eligibility. That's the only thing targeted by this exemption, Your Honor. So every word of the statute has effect. And in fact, any other construction of the exemption authority would do violence to the carefully calibrated scheme that Congress intended when it enacted the ADEA. We speak of congressional intent. Congressional intent was to provide a general provision with general prohibitions and at the same time provide exemption authority to the EEOC to be able to tailor the Act's general application in specific contexts. Congressional intent specifically contemplated that confident the EEOC would provide exemptions. Now, I direct you to the central... If you're right about that, what does that do to the safe harbors built into the Act? Well, I'll direct you to a case that they cite to. The Quinn case, which is a district court case, cited some of the exemptions in the Act and then says Section 9 does indicate that Congress intended further exemptions to be provided by the agency. Now, the question in the Quinn case, of course, said Section 9 is not an issue because the agency had not used that exemption authority. But the district court there recognized that was the case. I also direct you to the Central and Southern Motor Freight Association case. It was a case in which it had an august panel of Judges Skelly Wright, then Judge Scalia, and Wilkie. And they expressly explained that categorical exemptions from statutory provisions are not disfavored where that exemption authority is rooted in an express power granted by Congress in statute. It's useful to take a step back and look at what the AARP relies upon for their case. They cite the New York v. EPA case in their brief. If you look at page 16 of the slip of paper, which is attached to their reply, it makes very clear that what's at issue in that case is the EPA's interpretation of a substantive provision to provide an exemption without any authority to provide exemptions like we have in Section 9. The same thing is true with Quinn and then the American Marine Officers case involving the Service Contract Act, which was a predecessor to the Section 9 exemption. There was no such determination of an exemption in that case. So again, when we're talking about an exemption authority provided by Congress to an agency, Congress intends the agency to provide exemptions from things that would otherwise be prescribed by the ex general prohibitions. Mr. Jay, can you hear me? This is John Alderson. I can, Your Honor. I would like you to help me out and my colleagues too. Would you give the reasoning of the District Court case and how you differ from that in your presentation before us? All right, Your Honor. First of all, we agree with the District Court. We agree with the District Court and its APA. Excuse me? You agree that you would. Well, of course. We agree with the judgment, Your Honor. We also agree with the District Court's APA reasoning. Now, where we differ is its approach to the exemption. The District Court essentially said that Erie County interpreted ambiguity in Section 4A. Because there's ambiguity in Section 4A, the agency could have interpreted as an interpretive matter Section 4A to exclude this category of conduct. Because the agency could have interpreted Section 4A not to apply, the agency has exemption power to do the same thing. Well, if that were the case, Your Honor, this is where we disagree. If that were the case, the exemption authority means nothing. Because if the agency already had interpretive authority to construe ambiguity in the statute to get to the same result, and if its only authority were to do that, Congress's provision of an express exemption provision would mean absolutely nothing. Because an agency always has the authority to construe ambiguity in the statute. And when Congress provides an express provision, and you can't phrase it in any more emphatic terms than Congress did, the EEOC may establish such reasonable exemptions from any or all provisions of the Act. Where Congress speaks with that direct and clear voice, the agency is vested with the authority to provide, as the agency has done here, reasonable exemptions that target a specific type of conduct, where that conduct leads in unexpected results which are contrary to the public interest. I wanted to ask you about what I saw as four potential ambiguities that were resolved by ERIE. Now, I'm not saying whether they were actual ambiguities, but one question was the basic question, are retiree benefits covered by the ADEA? The other one was whether retirement benefits that are adjusted post-employment are, you know, are covered. Whether Medicare eligibility is a factor, quote, other than age. And the last one was whether the cost of Medicare itself as borne by Medicare can be considered as equalizing the cost. And I thought all four of those issues were discussed and resolved by ERIE. And I was wondering if EEOC thinks that they're all still non-ambiguous and correctly decided. I would direct you to footnote 14 on page 32 of our brief, which says it's unclear from ERIE County whether ERIE County itself was based on a resolution of ambiguous terms or plan language. And there certainly is material in the opinion as we kind of highlighted in our description in our brief, which would suggest that the court was resolving some uncertain ambiguity in the act. But we're not taking the position. We feel that the court's probably much better positioned to tell us what it was intending when it provided for ERIE County. But the bottom line is it doesn't matter. Okay, so all four of those are potential ambiguities, and you're not taking the position as to whether they were actual ambiguities. But that's right, Your Honor, because it doesn't matter whether it's resolving ambiguity in a provision or whether the provision itself speaks with absolute clarity. An exemption from any or all provisions of the act doesn't matter how you get to the interpretation of the provision. The exemption would apply regardless if that provision is ambiguous and it's construed through extrinsic means or whether the provision is clear. Congress either way intended, in its own words, intended to give the EEOC the power to provide for exemptions from any or all provisions of the act. What do you mean terms of ambiguity? Is that the court or is that the agency? Well, it depends on what ambiguity you're speaking about, Your Honor. We're not taking a position on the question of Section 4, whether it's ambiguous, because this case is about Section 9. Section 9 is the exemption authority. Now, when we're dealing with a statute like the ADEA that provides for the agency to promulgate regulations and to fill the gap, the agency, Brandeis makes this very clear, the agency has the authority to fill the gap. And that gap, to the extent there's any gap, it would have to be in this case in Section 9. And frankly, I think it's difficult to find any ambiguity in the emphatic terms that the agency may establish reasonable exemptions from any or all provisions of the act. Can I try something on you? Sure, Your Honor. Suppose you lose on your argument that you can have an exemption that contradicts the terms of the act. Suppose you lose on that. Then where are you? Well, Your Honor, unfortunately, we've lost Section 9 because Section 9 Suppose you lose Section 9 as you understand it. Then where are you? What do you want us to do? Well, Your Honor, if we cannot provide for exemptions from the act, and that's what the agency did here, you would have to reverse the district court. Okay, so you accept that Erie resolved everything, and you accept that that is the proper resolution of all those issues. Well, we're not contesting Erie County. Erie County dealt with, at a minimum, what was the best interpretation of Section 4. Okay. And what the EEOC is saying But you're putting best, and the rabbits keep jumping in your head here. Well, no, no, that's right. But it doesn't matter, Your Honor, because Is it the only interpretation of the statute and of all four of those issues that I My selection of best was interpreted, it was intentional, Your Honor, because we're not taking a position as to what Erie County purports to do, because it is not relevant to the disposition of this case. But you said best to keep the Brand X door open. That's why best became Well, Your Honor, we're not relying on Brand X, as you can tell from our briefs. But I know that's why I said to keep it open. The exemption from the very beginning, the EEOC has never purported to challenge the Erie County's interpretation of Section 4. Given that interpretation, given the unexpected consequences that resulted from the EEOC's implementation of its enforcement policy, which adopted Erie County, it took the step of promulgating an exemption from Section 4 in the narrow context of this retiree health benefits, where those benefits are coordinated with Medicare eligibility. That is something that was done solely within the authority of Section 9. It was not ever intended to interpret Section 4. So if you find that the Section 9 authority is gone, evaporates, then we lose this case. Because that's what the agency did. The agency never purported to interpret Section 4. I find this very odd for a government agency to basically throw away what the district court did here and not even rely on it as an alternative. If it were a legally feasible alternative, Your Honor, we would defend it. However, if you look at decisions like INS v. Ventura, which deal with agency decision making, you have to look at what the agency did. You can't create another rationale for an agency post hoc, whether it's courts or counsel standing before you. What the agency did here, and I'm being completely forthright with the court, and I think there's really no question, when you look at the exemption, when you look at the regulation, it's all about Exemption 9. It's not about construing Exemption 4. That power, again, if you look, you have to construe a statute in its total. If Congress provides, it shall be unlawful to do X, and that same provision says, and the agency can provide exemptions. It's the same as if Congress is saying in one provision the agency shall be unlawful to do X, and then at the very end, as Congress did here, the agency is empowered to provide any or all exemptions from any or all provisions of the Act. That is what this case is about. So what you're saying is if this court were to decide that Erie did not provide the only interpretation and that these were ambiguities, and if the court sent it back to the EEOC to say resolve the ambiguities, then you would say, well, we would resolve them exactly like Erie did, and we cannot make a regulation. As far as I know, the Commission's position, we've not challenged Erie County, Your Honor, and we're not relying on Erie. Am I right? Is that what you would do? You would say that was the proper interpretation, that even if there's an ambiguity, we would still resolve it that way, and if we can't do it with an exemption, we can't do it. My understanding of the agency's position is that that is correct. Of course, Grand X also suggests that agencies can change their interpretations in light of subsequent events as they implement the Act. But the agency's view of Section 4 is that Erie County properly resolves it because Erie County adopts the best interpretation of Section 4. That said, that has never been what this case is about. This case is then about Section 9, and Congress's decision to provide an agency with the power to exempt, provide exemptions for any or all provisions of the ADEA. There is no reasonable way to interpret Section 9, and that authorization of authority is, you know, confronted by Judge Escalier in Scalia, in the Central and Southern Motor Freight, or in Donovan as a predecessor to the statute. No reasonable way to construe it other than what we're doing here. And then the question, of course, becomes, did the agency act arbitrarily and capriciously? Well, there's been very little serious challenge to that. The Court is, I think, properly focused. The only way that one could, the AARP, the best argument is on the statute, and that's a pretty meager argument, or on the non-delegation doctrine, which post-1930s, frankly, has never been a particularly great argument to raise when a statute provides, as the statute here provides, guidance to provide exemptions when they're necessary and proper in the public interest. Since the Atchison case, the Intermountain Raid cases in 1914, Congress acknowledged that agencies can provide exemptions when Congress so provides, and it's not a non-delegation doctrine problem. And the McManus decision in the Second Circuit, same thing, exempting contracts from the application of the antitrust law. But this, of course, is limited to situations where the agency has been given express authority by Congress to provide exemptions from the Act. And when Congress has so spoken, and spoken clearly, as Congress has done here, the agency's exceptions prevail. See, the only thing, the thing that troubles me most about the argument is we said, and I don't think it, this does not, this concern with your argument does not meet the thrust of the point you're making. But I'll share it with you nevertheless. We did say, we said it indirectly in the recounting, because we cited the Johnson case out of the Second Circuit, and then had a parenthetical quote in there where we were trying to respond to the potential argument that allowing an employer to factor in Medicare eligibility in determining retirement benefits was reasonable. And at least from my perspective, it strikes me as reasonable. Absent the ADEA, it strikes me as eminently reasonable. But we then went on to say that an employer has, this is the parenthetical explanation of the Johnson and Higgins case out of the Second Circuit. An employer has a defense if his policy is based on reasonable factors other than age, not if the policy is reasonably based on age. And that seemed to me to be a pronouncement of our interpretation of the public interest as embodied in the EDEA as amended. Well, Your Honor, I don't believe, if we were working on a blank record where the EEOC were to say, we think that maybe it's just a good idea to provide an exemption notwithstanding the general applicability of the act. Such an exemption would never fly. But this was done after Erie County, after Erie County was issued, the EEOC adopted it, and it said we are going to enforce this provision to require complete equality in the retiree health benefits context. And what they found is what would happen exactly in Erie County, benefits were reduced. And in that context, this is where Exemption 9 comes in. The agency carefully looked at the problem and figured out why is it, what would be the best policy rationale here? Is there a reason, is there some justification for providing an exemption? Is there a valid justification for doing so? And they were told by unions. They were told by employers. They were told by benefit professionals that what was happening was contrary to public interest. It was leading to a reduction in health care benefits as a result of numerous other factors, one of several factors. My concern then is, and that's what I said at the beginning during your friend's argument, is then you amend the statute, you change from ADEA. As we explained earlier, Congress already provided for this in 1969 when it enacted the ADEA. The proposal from the Secretary of Labor embodied several exceptions to the general provisions. One of those exceptions was the exemption power given to then the Secretary of Labor to provide exemptions from any or all provisions of the Act. Congress knew that age, unlike sex or race or other factors embodied in Title VII, has certain unusual characteristics and that it is not desirable to apply the general prohibitions in the whole variety of contexts that those prohibitions might apply. And that's why Congress provided for the agency in its discharge of its statutory responsibilities to provide exemptions where it is found necessary and proper in the public interest. Erie County never confronted that. No exemption was at issue in Erie County. All of this was developed after Erie County and led to the agency's conclusion that it was necessary and proper in the public interest to provide an exemption under Section IX. That is a power that cannot be overturned in this case because I think, as you suggested, it's a completely rational and reasonable thing for the agency to be doing here, and that means the only question left is whether the statute provides it. The statute clearly provides the exemption authority separate from Section IV. It's an exemption authority to exempt any or all provisions of the Act, and then whether that is constitutional. In the Intermountain Rate cases, McManus, and all the general non-delegation cases that we've started to provide, where Congress has specified the intelligible principle to guide agency action, here it's necessary and proper in the public interest. Congress can legislate in broad terms and can provide the agency with power and the ability to implement that. You're interpreting then the safe harbor provision to have another kind of invisible clause sitting there which reads something like, and such other exemptions as the agency may create from time to time. That's what it says in Section IX. That's precisely right because Section IX, again I'll bring you back to Section IX, Congress doesn't have to, there's nothing special about Section IV. There doesn't have to be an exemption power rooted in 4B3I. It can be anywhere in the statute. Congress knew that, and when enacted Section IX, it said the exemptions may apply to and from any or all provisions of this chapter. That is, any or all provisions of the ADEA. Whether it's in Section IX or in Section IV, it makes no difference, except unless Congress intended it to. And Congress's intent to provide exemptions from any or all provisions of the Act clearly encompasses Section IV, Section III, any of the sections, any provision of the Act Congress intended to allow the EEOC to provide exemptions from. So again, we come back to Section IX. Section IX is the crux of this case. The plain language of Section IX is clear. I understand your argument. I mean, let's go over a ways, but when you say we come back to Section IX, I'm anxious, unless my colleagues have any further questions of you. I think I herded Mr. Marconis into the wrong corral. He was heading into the Section IX corral when he got up, and I headed him back into the Section IV corral. So let me see if I can steer him, no pun intended, back to where he was when he first started out. Thank you, Your Honors. Thank you. Do you want to jump back into Section IX? Your Honor, I appreciate the invite to go back to the Section IX corral, and I think it's relevant to one issue that Judge Rustani raised. Let me just focus the court on the language. The government says Section IX, Section IX. The very first clause of Section IX says, it says pursuant to the notice and comment provisions of the Administrative Procedure Act, the EEOC may do A and B. A, they may issue rules and regulations that are necessary or appropriate, pretty broad standard, or they may issue reasonable exemptions. Not any exemption. They want you to believe it says any exemption. It doesn't say that. Now, the crux of Section IX, the problem I'm having, is the government ignores the incorporation of the Administrative Procedure Act. Keep in mind, when I opened my argument, Section 706, this suit was brought under Section 706, the review provision of the APA. Under 706 sub 2, which is incorporated into Section IX, we know, an agency may not take action. In fact, it says the court must set aside agency action that's arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law. Now, stop for a second and think. They've got authority to do two separate types of things. They can issue regulations under Section IX. Everybody would agree that you can't issue a regulation that exempts conduct or does anything else that's contrary to law under Chevron or under Section 706. You can't do it. That's what 25 years of Chevron jurisprudence has established. When you said everyone accepts that, I don't think he accepts that. I think your opposing counsel accepts that the law may provide one thing, but it also provides for exemptions, and his exemptions can be in contradiction of the words of the statute. If he's saying that, Your Honor, it's wrong, and the reason it's wrong is because the APA is incorporated and governs their conduct to issue exemptions and regulations. They say that there is no contrary to law standard. We don't ever have to refer to the substance because an exemption clearly allows us to exempt conduct from the substance. But to get there, you have to find that Section 706 of the APA isn't applicable to their exemption authority, even though it's right in Section IX. Somehow we're getting in a circle because he says it's not contrary to law if it's within our exemption authority. Well, but no Chevron court, Your Honor, and we made this point in our brief, no Chevron court has ever applied the contrary to law standard to the rulemaking delegation. For 25 years... Well, have they applied it? Well, what about in exemption cases? That's where I was stuck before, Your Honor. On page 36 of the brief, the AFL-CIO v. Donovan case, that's a regulatory, it's regulations and exemptions. It's the contrary to law standard under Chevron and under 706. And on page 30 of the government's brief, they cite to a case Bray v. United States. It's a Department of Commerce case where they issued an exemption, and the EEOC ignores the 706 standard there. So they weren't applied. I'm afraid that what you are saying in very elegant language, that this is a delegation by Congress to do an exemption like this. I think you're coming to that. And I think you are asking us to go back and check the polls, that Congress does not have the power to give them the power of issuing an exemption. That's what I hear you saying. Well, Your Honor, I believe that the contrary to law standard in the APA and as applied to Chevron, does not require that the court reach that part of the decision. But if the government claims, and this court agrees, that this rulemaking delegation allows the government to overturn plain provisions of the statute, contrary to congressional intent, I agree with you, Your Honor, that that is a separation of powers problem, and it's an unconstitutional delegation. I don't think the court has to get there to resolve this case. I think that the district court got it right the first time. Are you saying, then, that although there is a specific grant of authority, the authority is limited, the authority to make an exemption, the authority is limited by the provisions of the Administrative Procedure Act that it must not be arbitrary and capricious. So then, if we find that the exemption is arbitrary and capricious, you're home. But if we find that under the circumstances, given what happened after Erie, then, if we find it reasonable, you can't win on this argument. I think, Your Honor, just to put a fine point on it, the Administrative Procedure Act has a two-level approach. One is the not in accordance with law standard, which is just like Chevron's step one. And then, secondly, you would go to the arbitrary and capricious standard. In closing, I said incorporate that in my comment. Yes, Your Honor. I said incorporate that in my comment. And I still think that was the same one. In closing, let me just, the Bray v. United States case, the government cites it at page 30, the court ruled that the exemption authority in that case was limited by the plain language of the statute. And, significantly, the court said that any other reading would give the agency carte blanche to rewrite the statute under the umbrella of its exemption authority. That's at page 1055. Thank you very much for your time. I think you would agree, and maybe you wouldn't, that if we get past everything else, and there's some total hurdles here to get past. Sometimes, in this case, I don't even know what everything else is. But this exemption would seem to be, and I don't mean exemption in the ADA since then, would seem to be reasonable. To say to an employer that you can consider Medicare eligibility when you come up with retirement benefits for Medicare eligible retirees is okay. That would seem to me to be reasonable. It may not be legal. It may be a violation of the ADEA. It may be a violation of the APA. But taking all that aside, just on the face of it, it would seem to be a reasonable thing to do. Would you agree to that? It doesn't mean you lose. Your Honor, the irony of this case is that that's precisely what the safe harbor allows. That's what Congress said we want to allow employers to do. Equal cost, equal benefit. Well, but the employers get a free pass on Medicare. They don't pay for it, but they can take into account the benefits that it has provided. So the point there, which relates to the arbitrary nature of this alleged cost cutting, benefits that Medicare retirees get in retirement are substantially less expensive than benefits of younger retirees. No, you made that point in the brief. It was an interesting point. Well, Your Honor, one last point on that. Keep in mind, too, that Congress, in passing the OWBPA, it provided an offset. As the Court noted in Erie, there's a health care offset for severance benefits, and the statute specifically assigns a value to the health care benefits in retirement for these individuals. So the reason the government doesn't support the district court's rationale about there being ambiguity here is because there is no ambiguity here. Well, can I ask you a question, a big-picture question here? You must disagree with the EEOC survey about what's going to happen out there in the real world, because you obviously think that the regulation as it is is beneficial to aging. Your Honor, my clients agree that there's a health care crisis, and it's important to do everything we can to try and preserve whatever health care benefits we can, particularly for people in retirement. But the answer, just like the agency told Judge McKee in the panel, in the Erie case, the answer to that conundrum is to not arbitrarily select a group of people for discrimination. The answer is to comply with the statute, to adjust benefits in conformity with this very, very adjustable equal-cost, equal-benefit rule. So I don't know if I'm answering your question, Your Honor. I'm trying to. I think it's a problem. I don't think... I think if any... Obviously, if you believe, or your group, your client, believes that this regulation as it existed, without the new regulation, was causing companies to drop their coverage of retirees, you wouldn't be arguing it this way. Well, the retiree coverage has been influenced by any number of factors. There's a financial accounting standards board. There's overall costs. There's the catastrophic escalation of health care. So the answer is yes. Health care costs are increasing. The amount of coverage is declining. But the attitude of my clients, both those below 65 and over 65, is we're willing to pitch in, but this law does not allow us to be targeted to pay a disproportionate penalty. Thank you. Did you all decide anything else? Judge McKee and Judge Rustani, can you hear me? Yes. I think that the argument's been splendid. And I would ask the court to agree to have a transcript of this oral argument prepared. Fine. I would like to get a transcript. I was just making a note to myself. In the 11 years I've been here, I may have seen arguments as good as this. Not many. Maybe a handful. Maybe two or three. I've never seen one better on both sides. Mr. Macaronis and Mr. Yang, you're really to be commended. Sometimes we'll get good arguments that are not very helpful. Sometimes, not often, we'll get helpful arguments that are not very good, usually because somebody says something to give the case away and make the other side's case look better than it is. But to get two cases presented, not only in argument but in the briefs also, as thoroughly and scholarly and responsibly, because you listen to questions that are asked and you answer the questions that are asked. Boy, that's rare. I don't see a lot of lawyers doing that. I just really want to commend both of you. I may come back. Yeah. Thank you, John. Thank you. Thank you, Judge Officer. Thank you. And could you talk to Ms. Fidler on the preparation of the transcript and how we'll take care of that? I guess what we should do is reset for about 10 minutes and then we'll come back and discuss this with you and then we can hopefully resolve anything about the transcripts. All right. You can call us when you need to. Thank you. I guess we're not recessing. We're breaking and then we'll just come back in. Is that how we see, Judge Officer? Yeah. What we're going to do is do a conference call in my chamber. It'll be easier to try and coordinate the video. So let them know we'll conference. We'll call them back. And from my chamber, we'll conference it that way. All right. Thank you. This court is now adjourned until Thursday, March 1st. Thank you.